Littleton, Judge,
dissenting:
I am unable to agree with the opinion of the majority and the concurring opinion in this case. I think they fail to meet and adequately answer the question presented. This case presents an important question of contract law and statutory interpretation. No decision has been found which is entirely decisive on the facts and circumstances of this case under the general rule that the positive authority of a decision is coextensive only with the facts on which it is made. However, the decided cases, I think, announce and establish the legal principles which when applied to the facts and circumstances of this case provide the correct answer.
*412 Plaintiff in this suit, which was instituted July 9, 1940, seeks to recover the stipulated rental due under the lease for the months of September 1939 to June 1940, inclusive, in the principal amount of $250,000 with a. credit of $987.29, the lease having been canceled by the Postmaster General, effective as of August’ 31, 1939. By its terms the lease did not expire until September 30, 1941, and in another suit, No. 45269, recovery is sought for the rent stipulated in the lease for the subsequent quarter, July 1 to September 30, 1940. The contention made by counsel for the defendant in this case is as follows: “Defendant’s position is that the act of 1885 which was subsisting law at the time of the creation of the lease here in question entered into that lease and became a part of it just as-clearly as.if its language had actually been, retained in the lease ;atbat the repeal of that, which repeal took place after the lease in question was entered into, did not and could not delete that provision from the lease.”
The majority opinions sustain that contention on the ground — first, that the existing statute entered into the contract; second, that the repealing act of June 19, 1922, was not retroactive,;, and,, third,- that' it may b'e-assumed that if' Congress, had deliberately, put its. mind on the matter,uf the possible effect'of'the repealing act upon existing contracts it would probably have expressed an intention that a future contingent right of the government under the repealed statute should not be affected by the repealing enactment.
The first two grounds stated may be conceded, but I think they stop short of answering the question presented, and the third is not, in my opinion, a permissible interpretation of a statute since the language of the statute in-question is plain and its effect is, .arid was at the time, well established.
The lease contract, which was for a period of 20 years from October 1, 1921, was executed March 10, 1922, and did not itself contain any provision giving the defendant the right to cancel the lease if a publicly owned building should become available during its term and, as will hereinafter be shown, it appears that the United States, represented by the Postmaster General, and plaintiff intentionally left out of the lease such a provision as a contractual *413 stipulation by the parties, thereby leaving the matter of whether the lease would or would not terminate or be subject to cancelation to depend solely on the continued existence or nonexistence of the statutory provision in the act of March 3,1885,23 Stat. 385, 386. That statute contained a clause, among others, that a lease for a post office should cease and terminate whenever a post office could be moved into a government building. Had the termination clause of the Act of 1885 been in force and effect, or if the existing statutory saving clause (sec. 29, Tit. 1, TJ. S. Code), which impliedly and by operation of law was incorporated in and became a part of the repealing act of June 19, 1922, had continued the termination clause of the 1885 Act or had saved the future contingent right in the Postmaster GeneíaTtc cancel the lease, his action in canceling the lease effective as of August 31, 1939, would have been in all respects legal. But the termination clause of the Act of 1885 was not in force and effect at the time the lease was canceled and had not been for 17 years prior thereto. The saving clause, which became a part of the repealing act and expressed the intention of Congress as fully and effectively as if it had .been incorporated in and enacted as a part of the repealing’act, did not continue the lease liable to termination nor preserve the right of the Postmaster General to cancel it. That saving clause only preserved the Act of 1885 as to a liability incurred or a right accrued at the time of the repeal, neither of which existed in this case.
The Act of March 3, 1885, supra, was in force at the time the contract of lease was signed by the parties on March 10, 1922, and that act did give the defendant the right to terminate the lease in a certain event, and, of course, that right could be exercised under the statute by the defendant upon the happening of such event, even though such right was not given by the lease as a contractual stipulation as distinguished from the existing statute, providing the statutory provision was in force at the time the right to terminate or cancel accrued. College Point Boat Corp. v. United States, 267 U. S. 12; Russell Motor Car Co. v. United States, 261 U. S. 514; De Laval Steam Turbine Co. v. United States, 284 U. S. 61, 73. However, the contingency upon the hap *414 pening of which the Act of 1885 conditioned the right to. terminate a lease, and upon which the lease might have been canceled, never arose while the Act of 1885 was in effect,, and the repeal of that act without any provision effectively-saving the future right to terminate the lease presents a question which was not considered or decided in any of the-cases cited in the opinions of the majority.
The right to terminate or cancel the lease did not arise until May 27, 1939, after the Act of 1885 had been repealed' on June 19, 1922, and when it was no longer the law, either-by a contractual stipulation or by statute, that the defendant might terminate or cancel the lease if a publicly owned’ building should become available. Therefore when the-Postmaster General in 1939 canceled the lease he was not-exercising any authority given to him by the contract, nor-was he exercising any power or authority conferred upon him by law. The authority which he previously had under the Act of 1885 had been taken away. As will hereinafter be shown, the contract was made and signed when the matter of the repeal of the Act of 1885 was under consideration by Congress and at a time when it appeared probable that that, act would be repealed.
There can be no doubt that the repeal of a statute operates, upon and affects existing arrangements and contracts, and destroys or abrogates all rights existing under the repealed act which had not become vested prior to the repeal or which-, are not preserved by an appropriate provision to that end,, or by some express contractual stipulation. Thus, in Hertz, Collector, v. Woodman, 218 U. S. 205, 216, the court said:
There are cases which go so far as to say that the-unqualified repeal of a law as effectually destroys rights- and liabilities dependent upon it, not past and concluded, as if the statute had never existed. It is, however, putting it strongly enough to say, that an unquah-fied repeal operates to destroy inchoate rights, as a release of imperfect obligations and as a remission ofpenalties and forfeitures dependent upon the destroyed-statute. United States v. Reisinger, 128 U. S. 398; Curtis v. Lovett, 15 N. Y. 9, 152 et seq.; Town of Belvidere v. Warner R. R. Co., 34 N. J. L. 193; 1 Lewis’ Sutherland Stat. Const., secs. 282 et seq.
*415 See also Crawford’s Slat. Const., secs. 93, 296, 316; Black, Interpretation of Laws (1911), sec. 124, p. 421; Canal Co. v. Ray, 101 U. S. 522, 527.
The case of Louisville Woolen Mills v. Johnson, 228 Fed. 606, furnishes a good illustration of those rights which are lost by repeal of a statute and those which are not. In that case Section 2487 of the Kentucky Statutes was in effect when the Louisville Woolen Mills contracted with the Tapp Clothing Company to furnish it certain supplies. This statute gave the vendor a prior lien in the case of an assignment for the benefit of a creditor. While this statute was in force a portion of the goods was delivered, and a portion was delivered after the statute had been repealed. The court held that as to those goods which were delivered prior to repeal of the statute the vendor had a lien, but as to the goods delivered under and pursuant to the contract after repeal of the statute it did not have a lien.
When the Act of 1885 was repealed, the right of the Postmaster General to terminate or cancel the lease no longer existed and it no longer existed because the Government through, an act of Congress took away the right. At the time of the enactment of the Act of June 19, 1922, repealing the Act of 1885, Congress knew that there were a number of long-term leases outstanding; in fact, there were 4,281 of such outstanding and existing leases for terms of from 5 to 20 years. In 1922, before this lease was made and signed and before the enactment of the repealing act, the attention of the Joint Commission on Postal Service had been called to the fact that the premises covered by the 20-year lease in the ca'se at bar had not been completed, and the matter of the acquisition of those premises' by the department was discussed before the Commission at some length. The Postmaster General on November 15, 1921, in his annual report for the fiscal year ended June 30, 1921, pursuant to section 388, U. S. Code, Title 5, reported to Congress that there were 4,281 long-term existing leases. While it is true that the repealing Act of 1922 was prospective in operation, it, nevertheless, affected existing leases insofar as a future contingent right of the Government under the Act of 1885 was concerned, the only authority for the exercise of which *416 was contained in the repealed statute, and not as a distinct contractual stipulation by the parties in the lease. While it is also true that by virtue of a statutory provision that a lease should cease and terminate upon the happening of a specified event “the right to cancel became, by implication, one of the terms of the contract” because that statutory provision was in effect at the time the contract was signed,—College Point Boat Corp. v. United States, supra; Russell Motor Car Co. v. United States, supra; Farmers amd Merchants Bank of Monroe, North Carolina, et al. v. Federal Reserve Bank of Richmond, Va., 262 U. S. 649, 660 —the subsequent repeal of that statutory provision with an existing express saving clause which did not preserve the right to cancel, .impliedly as well as expressly,11 think, took away the right t'ó cahcel. OrdiMiily 'a''statute- is ndt p given a retrospective effect, but this rule does not apply in the case of a repealing statute so far as concerns its effect upon existing or future rights; such a statute operates to eliminate from the law the statute repealed and to destroy all rights thereunder, unless these rights had become vested prior to the repeal or were such that the legislature or Congress was- without. authority or power to impair or change. See Lynch v. United States, 292 U. S. 571; Indiana ex rel. Anderson v. Brand, Trustee, 303 U. S. 95. In Railroad Co. v. Grant, 98 U. S. 398, 401, 403, involving a case where Congress in 1879 repealed a former statute, the court said:
It is equally well settled that if a law conferring jurisdiction is repealed without any reservation as to pending cases, all such cases fall with the law. [Citing cases.] Sec. 847 of the Revised Statutes, * * * is in irreconcilable conflict with the act of 1879. * * *.
The act of 1879 is undoubtedly prospective in its operation. It does not vacate or annul what has been done under the old law. It destroys no vested rights. It does not set aside any judgment already rendered by this court under the jurisdiction conferred by the Revised Statutes when in force. But a party to a suit has no vested right to an appeal or a writ of" error from one court to another. Such a privilege once granted may be taken away, and if taken away, pending proceedings in the appellate court stop just where the *417 rescinding act finds them, unless special provision is made to the contrary. * * *
It is claimed, however, that, taking the whole of the act of 1879 together, the intention of .Congress not to interfere with our jurisdiction in pending' cases is manifest. There is certainly nothing in the act which in express terms indicates any such intention. Usually where a limited repeal only is intended, it is so expressly declared * * *. Indeed, so common is it, when a limited repeal only is intended, to insert some clause to that express effect in the repealing act, that if nothing of the kind is found, the presumption is always strong against continuing the old law in force for any purpose. * * * No declaration of any such object on the part of Congress is found in the law; and when, if it had been the intention to confine the operation of what was done to judgments thereafter-rendered-or to cases not pending, it would have beéir so[1] easy to have said so, we must presume that Congress meant the language employed should have its usual and ordinary signification, and that the old law should be unconditionally repealed.
See also to the same effect, Bank of Hamilton v. The Lessee of Ambrose Dudley, 2 Pet. 492; Norris v. Crocker et al., 13 How; 429; Dodge v. Woolsey, 18 How. 331; United States v. Tynen, 1 Wall. 88, 95; Gross v. U. S. Mortgage Company, 108 U. S. 477; Flanigan v. Sierra County, 196 U. S. 553; Hubert v. New Orleans, 215 U. S. 170; National Surety Co. v. Architectural Decorating Co., 226 U. S. 276; Mackenzie v. Hare et al., 239 U. S. 299; Thompson v. United States, 246 U. S. 547; Iselin v. United States, 270 U. S. 245, 251; United States v. Chambers, 291 U. S. 217; Massey v. United States, 291 U. S. 608.
In the case at'bar the contingency in which the defendant had the right to cancel'.this lease-[1] never'arose while the statute giving it this right was in effect, and the contract, under which the Postmaster General purported to act, did not by any stipulation then in force or effect expressly or impliedly give him that right. Therefore, no right to cancel existed in 1939 and no such right had ever become vested while the Act of 1885 was in force. Cf. Steamship Company v. Joliffe, 2 Wall. 450, 458. The repeal of the statute effectively eliminated any effect which it therefore *418 had upon the contract, since there can be no question as to the authority of Congress to do this or to waive a statutory or contractual right intended solely for its benefit. The Act of 1885 was enacted for the benefit of the defendant. Even though the statute had actually been incorporated in the lease, it could be waived by Congress, who had imposed the condition, because it was incorporated and intended for the benefit of the government. Wade, Retroactive Laws (1880), sec. 25, p. 29; Sheehy v. Mandeville and Jamesson, 6 Cranch 253, 263; State of Maryland v. Baltimore & Ohio R. R. Co., 3 How. 534, 542, 546; Shutte v. Thompson, 15 Wall. 151, 159; Jones v. United States, 96 U. S. 24, 28; United States v. Reisinger, 128 U. S. 398, 401; Hays v. Port of Seattle, 251 U. S. 233, 237. The later unqualified repeal of the statute saving only incurred liabilities or accrued rights was a waiver of benefits conferred upon the defendant by the repealed portion of the prior act.
We are not here concerned with a contract between private parties entered into in the light of a statute giving to one of the parties a certain right subsequently taken away or impaired by repeal of the statute which conferred it., In such cases, as the decisions will show, the Supreme Court has always found it necessary to decide whether the legislature possessed the authority completely to take away the remedy or to impair the right or obligation. The Supreme Court has never been able in such cases to adopt the easy expedient of presuming that such a statute should be construed, in the absence of clear language to that effect,' as intended to affect or operate only upon future arrangements or contracts. Here, no act of a third party affecting the contract is involved. No question as to an unlawful impairment of an obligation, express or implied, of a contract is present. See New Orleans v. New Orleans Water Works Company, 142 U. S. 79, 90-93; City of Worcester v. Worcester Consolidated Street Railway Company, 196 U. S. 539, 548, 552. Here the contracting party to whom the right to terminate the lease was given is the government which enacted the statute giving the right. Clearly it later had the power to forego this statutory right if it chose to do so. This it did when it unqualifiedly repealed the statute giving the. *419 right with an existing express proviso (sec. 29, Tit. 1, TJ. S. Code) which did not save the right.
The repealing act with the existing saving statute is plain and unambiguous, and should be interpreted and applied without resort to construction. However, if construction is necessary, I think the views and conclusions hereinbefore stated are fully supported by facts and circumstances disclosed by the written records, which the court can consider (United States v. Dickerson, 310 U. S. 554; United States for use of Noland Co. v. Irwin, et al., 316 U. S. 23; New World Life Insurance Co. v. United States, 88 C. Cls. 405), showing the background and history of execution of the lease in the case at bar on March 10, 1922, and of the enactment on June 19,1922, of the provision of the Post Office Appropriation Act repealing the provision of the Act of March 3, 1885.
The Act of March 3, 1885, ■ supra, making appropriations for the Post Office Department, was the first statute which authorized the making of post-office leases for a term longer than one year. This act authorized the Postmaster General to make leases for terms not exceeding five years. Later, in the Post Office Appropriation Act approved July 2, 1918, 40 Stat. 741, 746, the Postmaster General was authorized to make post-office leases for terms not exceeding ten years. In the Post Office Appropriation Act approved April 24, 1920, 41 Stat. 574, 578, it was provided “That hereafter the Postmaster General may, in the disbursement of the appropriation for such purposes, apply a part thereof to the purpose of leasing premises for the use of post offices, * * *, at a reasonable annual rental, to be paid quarterly for a term not exceeding twenty years.” This provision was enacted, as the hearings before the Joint Commission on Postal Service show (Yol. 1, p. 67), in order to enable the department to obtain more favorable rental terms and lower rental in its leases.
In the Post Office Appropriation Bill approved June 19, 1922, 42 Stat. 652, 656, the Congress appropriated $11,750,000 for rent, light, and fuel for first-, second-, and third-class post offices under existing leases and those made or renewed during the fiscal year ended June 30, 1923, and, in the sentence making that appropriation, enacted the clause: *420 11 And provided further, That that part of the Act approved March 3, 1885 (23 Stat. at L., p. 386), which provides that a lease for premises for use. as a post office shall cease and terminate whenever a post office can be moved into a government building, is hereby repealed.” . Section 4 of the Act of February 25, 1871,16 Stat. 431, 432 (sec. 29, Title 1, U. S. Code), the provisions of which are to be treated as if incorporated in and as a part of the above-quoted enactment repealing the Act of 1885 (Great Northern Ry. Co. v. United States, 208 U. S. 452), provided “That the repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.”
Section 6 (a) of the Post Office Appropriation Act approved April 24, 1920, 41. Stat. 574, 583, 584, created a commission on the postal service to be composed of a chairman and four members of the Committee on Post Offices and Post Roads of the Senate, the chairman and four members of the Committee on Post Office and Post Roads of the House of Representatives, and a postal expert appointed by the Postmaster General. Sub-section (c) provided that
The commission shall investigate all present and prospective methods and systems of handling, dispatching, transporting, and delivering the mails and the facilities therefor; and especially all methods and systems which relate to the handling, delivery and dispatching of the mails in the large cities of the United States.
On or before March 1,1921, the commission shall make a report to Congress-containing a summary of its findings and such recommendations for legislation as it may believe to be proper..
This Joint Commission on Postal Service made investigations itself and through persons employed by it for that purpose. It held formal hearings during the years 1920, 1921, and 1922 at which the Postmaster General, the Solicitor of the Post Office Department and Assistant Postmasters General, and other officials of the Post Office *421 Department testified. (Hearings before Joint Commission on Postal Service, Yols. 1 and 2).
In a report dated October 27, 1921, 67th. Congress, 1st sess., Senate Document #74, p. 20, the Joint Commission recommended that the clause in the Act of 1885, that a lease should cease and terminate whenever a post office could be moved into a government building, be repealed' in the interest of economy. Testimony was given before the Joint Commission with reference to long-term post-office leases and with reference to the mandatory provision of the Act of 1885, on certain dates between December 8, 1920, and June 3, 1921.[1]
In this testimony the efficiency expert employed and the officials of the Post Office Department testified and recommended that the termination clause of the Act of 1885 be repealed because it was mandatory and could not be waived, and that it had the effect of not only limiting the number of properties offered for rental but of increasing the rental costs to the Government through increased financing charges which prospective lessors had to pay to banks for funds necessary to finance the project of constructing a special building to suit the peculiar needs of the Post Office Department. Further testimony was given before the Commission with reference to the termination clause of the Act of 1885 by the Postmaster General and his assistants, and a representative of the Pennsylvania Railroad Company, with whom the Postmaster General was then carrying on negotiations for the construction of a special building for the Post Office Department under a lease for twenty years.[2]
On January 10, 1922, the Postmaster General testified before the Commission with reference to pending negotiations for 20-year leases for buildings in New York City to be specially constructed for the Post Office Department by the Pennsylvania Railroad Company and the New York Central Railroad Company, and with reference to the mandatory provision of the Act of 1885 regarding automatic *422 termination of term leases. The Postmaster General testified in part as follows:
One other proposition on this Pennsylvania deal. We can save about $75,000 a year in rental during the life of the contract if the statute were repealed which requires, or which allows, a cancellation of the contract in the event we want to move into a government building. We could get $1.58 or $1.60 per foot if that did not exist. There is that actual difference in their financing, in the willingness of the bank to loan the money, if you don’t have to have in the lease' the provision as now required by statute that we can at any time cancel this lease if we have a government building.
Now, if we could get legislation quickly so that we do not have to put that in, we could save $75,000 a year.
Representative Rouse. Do you want that kind of legislation ?
Postmaster General Hays. Well, $75,000 a year is a great deal of money. It is unfortunate that it costs that much to keep it in. There will be times, probably, where it would be very advantageous to have that provision in leases. The situation right now in the National Treasury and the postal situation in New York is such that we will, in my opinion, not want to cancel that for 20 years. * * *. I do not think there is any chance in the 20 years of our wanting to abandon it. Then we would find ourselves in this position: We would like to have that out so that we could save that large sum of money, and yet there may be times when we would find it advantageous to keep that provision. I think that is a question we ought to consider. That is the situation in New York. We find ourselves able to get a very much better rate by not having it cancelable at the option of the Postmaster General.
Lastly, in that regard, the Commission has recommended its repeal of that — -this Commission has. If you think you could get that repeal right away, we ought to take advantage of it in this matter.
The Chairman. The law ought to be framed so that it could be optional with the department in reference to this matter, so that it would not be compulsory in every case to include that provision. In cases where you are pretty certain that it looks likely that a building would be erected, such an option in the contract would be desirable, but I believe the last administration recommended that it be eliminated, but my understanding from the beginning has been that that should be optional with the *423 department, in making a contract. Where the department feels it would be desirable to have such an option, it should be included, but where, in such a case as the Pennsylvania Railroad Terminal, where I think your argument is good, it seems to me the insertion of such a provision, if it costs us $75,000, would be unwarranted, and the Congress would not be justified in forcing such an option into the contract.
Postmaster General Hays. I therefore hope that you will unanimously take such action as will quickly repeal that for the benefit of this contract, making it so that it gives an option as has been recommended by the chairman. * * *.
Representative Steenerson. The department hasn’t submitted any draft for a modification of this clause. It forbids a lease without the provision that it can be canceled when a public building is available. There may be some necessity for carefully considering the wording of that so as to comply with the suggestion of the chairman.
Postmaster General Hays. If that is the will of the Commission, and I cannot see but one side of that, we will at once prepare a bill — get it to you right away — as to how we think it should be worded, so that you can go over the actual bill.
Chairman. You can present that to the committee.
Representative Steenerson. Submit it to the different committees.
Postmaster General Hays. That will have to come pretty fast if it is to be of value.
Representative Steenerson. And I would suggest that you consider the proposition as to whether it should be general or simply applicable to these large cities.
Senator Moses. Under Senator Townsend’s suggestion of an option, optional on the part of the department, I see no reason why it should not be a general enactment.
Representative Steenerson. I would suggest you submit that to the Senate and House committees, so that they can give it consideration and get it started.
Thereafter, on January 23, 1922, the Postmaster General drafted a proposed act of Congress, which was in the exact language enacted by Congress in the act approved June 19, 1922, as hereinabove quoted, and transmitted that-proposed act to the Senate and the House Committees on Post Offices and Post Roads with the following letter dated January 26,1922:
*424 Section 322, Postal Laws, and Regulations (1885, Mar. 3, ch. 34223, stat. 386) reads as follows:
“Whenever any building or part of a building under lease becomes unfit for use as a post office no rent shall be paid until the same shall be put in a satisfactory condition by the owner thereof for occupation as a post office, or the lease may be canceled at the option of .the Postmaster General; and a lease shall cease and terminate whenever a post office can be moved into a Government building”-
In the report of the Joint Commission on Postal Service, submitting recommendations relative to additional postal service at Boston and Chicago, the Commission recommended, among other things, that the last clause quoted above be repealed, making it optional with the Postmaster General as to whether or not such a provision shall be inserted in the leases.
When I took this up with the Joint Commission at its hearing on Tuesday, January 10th, the Commission requested the Department to prepare legislation which would make the proper change in this law, and submit it to the Chairman of both the Committee of the Senate and the House for their action. Accordingly we have had the enclosed draft prepared. I would very much appreciate its early consideration by your Committee.
The proposed act as drawn and transmitted by the Postmaster General was introduced in the House of Representatives February 2, 1922, as H. R. 10244, entitled “A BILL Repealing the law relating to the termination of leases for post-office premises.” This Bill was referred to the House Committee on Post Office and Post Roads.
On March 3, 1922, before the lease in the case at bar was executed on March 10, the following proceedings were had at the hearings before the Joint Commission on Postal Service (Yol. 2, pp. 135, 136):
Mr. Edwards [Solicitor of the Post Office Department]. Someone said a moment ago that legislation would be necessary. Under the act of 1920, you know, we have the authority to make these leases up to 20 years. No legislation is necessary.
The Chairman [Senator Townsend]. I understand that clearly.
*425 Postmaster General Hats. Yóu' do not have the authority to do it without a provision to cancel in event of a vacant Government building. ■_
Mr. Edwards. We need no legislation at all to execute a lease for 20 years. The statute of April, 1920, provides that a post-office building may be leased for 20 years, and the next paragraph provides that a railway terminal station may be leased for 20 years. * * *
Postmaster General Hats. You are correct, except that there is a law that says we can lease for 20 years providing no Government building is vacant. If a Government building is vacant, that may cancel the lease.
Mr. Edwards. We need no legislation. There is a law — and this is what you have.in mind — which says that if another Government building becomes available that automatically cancels the lease. That is all.
The Chairman. Now, the present committee has voted to recommend — I mean the Post Office Committee now; not the commission — that that provision be omitted from the lease hereafter — that is, the imperative demand that it should be in there — and it will be left to the Postmaster General to determine; in cases, for instance, where we know there is never going to be a post-office building.
Mr. Hulme [Pennsylvania R. R. Company]. There was such provision in that statute at the time our proposal was made.
The Chairman. Would it have made any difference in the bid that you put in if that had been the law then ?
Mr. Hulme. I think it would, Senator; a very material difference. I think it would have affected the arrangements with the bankers.
Senator Walsh. The interest on the loan?
Mr. Hulme. Yes.
The Chairman. Suppose you put up the proposition to the Postmaster General on the theory that that is omitted.
Mr. Edwards. The fact that we would omit that from the contract could not change the law. The statute would still govern.
Postmaster General Hats. He is assuming that the law will be changed. I am very much in favor of that.
The Chairman. The committee is in favor of it.
Postmaster General Hats. It ought to be in the department to make a lease without that.
*426 The Chairman. - We have decided to repeal that law; that is, so far as our committee is concerned — the subcommittee. What the whole committee will do, or what the Congress will do, I do not know. But I feel pretty well satisfied that that provision will be repealed.
Senator Walsh. Your department recommended that, Mr. Hays?
Postmaster General Hats. Yes.
The Chairman. You might take that into consideration and see what figures you can get on that proposition.
While the matter of the repeal of the mandatory termination clause of the Act of 1885 thus stood the Postmaster General and the plaintiff executed the 20-year lease involved in the case at bar, which lease was approved in writing as to form by the Solicitor of the Post Office Department, and left out of this lease any stipulation as a matter of contractual agreement between the parties with reference to the lease ceasing or terminating, or being subject to can-celation by the Postmaster General in the future if a Government building should become available. The standard approved form of post-office lease, theretofore and up to that time in use, contained an express provision, as a contractual stipulation, for the right of termination for the several reasons set forth in the Act of 1885. A consideration of the facts and circumstances of this case show that the parties concerned knowingly and intentionally left this particular provision out of this lease because it appeared probable that the termination clause of the Act of 1885 would soon be repealed; and that they expressly included stipulations with reference to all other cancelable provisions of the Act of 1885, and some others in addition. Thus, the parties to this contract left and intended to leave the matter of whether the lease should terminate or be subject to cancelation on that ground to the continued existence or repeal of the Act of 1885. Neither party to the contract of lease thought that such a contingency would arise during its term of twenty years from October 1,1920, and the Postmaster General a few days before had so testified before the Joint Commission on Postal Service. It had previously been the practice of the Postmaster General to include in post-office leases an express provision as a contractual stipulation *427 by the parties that “And, it is further agreed that this lease shall cease and terminate whenever the post office, for the use of which this lease is made, can be moved into a Government building.” And, as above stated, the standard printed form of post-office lease theretofore used contained that stipulation. However, that standard form of lease, to that extent, was not used in this, casé but was differently written by the parties at the time so as to express théir intention. Thus we have, in substance, the same situation as was present in the case of Twin Cities Properties, Inc. v. United States, 87 C. Cls. 531, 541, in which case the negotiations for the lease were concluded December 29, 1921. Here they were concluded in September 1920. The proposal to construct a building and lease it in the Twin Cities case was accepted February 24, 1922, and the lease was finally executed when the building had been completed and accepted in October 1922 with the cancelable clause in the lease, but which, as the evidence showed, the parties did not intend should be in it.
Of course in the case at bar or in any case wñere a lease was executed before the Act of 1885 was repealed, the Postmaster General was without power or authority to waive á provision of an existing statute, but he had authority as the authorized contracting officer for the United States to make and execute a lease which would only be subject to termination or cancelation in the future if the Act of 1885 remained in effect. It is clear-that this was what he did. “A Government contract should be interpreted as are contracts between individuals, with the view of ascertaining the intention of the parties and to give it effect accordingly, if that can be done consistently with the terms of the instrument.” Hallerbach v. United States, 233 U. S. 165, 171, 172. Contracts made by the government are governed by the same rules as apply to contracts between individuals. Hunter v. United States, 5 Pet. 173,185; United States v. Bostwick, 94 U. S. 53,66; C. & N. W. R. Co. v. United States, 104 U. S. 680, 685; Perry v. United States, 294 U. S. 330, 351, 352.
The plaintiff in this case proposed in September 1920, after negotiations, to construct a building to the satisfaction of the defendant, and, after such building had been so con *428 structed and accepted, to lease the same for a certain rental to the defendant for a term of 20 years from October 1,192Í. There was, of course,- at that time no completed contract but. only an offer to make a contract. Cf. Ship Construction & Trading Co., Inc., v. United States, 91 C. Cls. 419. One year, to October 1, 1921, was allowed within which to construct the building to the defendant’s satisfaction. All negotiations were merged into the contract of lease subsequently executed which expressed all the agreements of the parties. The hearings before the .Joint Commission on Postal Service, (April 6, 1921, Vol. 1, pp. 207, 208), show that plaintiff had experienced some financial difficulties and had been delayed in the completion of the building for the Varick Street Parcel Post Station. The building appears to have been completed and accepted on or about March 10, 1922. The lease, when made and executed, was therefore not one for twenty years, as the parties had originally contemplated would be the case, but only for about- nineteen years and six months. This situation doubtless had some bearing upon the action of the parties in leaving out of the contract an express provision for termination of the lease. When the lease was executed on March 10, 1922, there was reasonable probability that the termination clause of the Act of 1885 would be repealed. The Joint Commission on Postal Service had so recommended and had instructed the Postmaster General to draft the desired legislation to accomplish that. purpose, and he had done this and transmitted the proposed bill to the appropriate committees of the Senate and the House with his positive recommendation that the existing statute be repealed. Therefore, the Solicitor of the Post Office Department was in error when he wrote plaintiff on June 16, 1939, that the action of the Postmaster General canceling the lease was in accordance with the terms of the contract, for the reason that the contract contained the provision that “It is further agreed that this lease shall cease and terminate whenever the post office, for the use of which this lease is made, can be moved into a Government building.” Of course, the contract did not contain that stipulation. If such a provision as a distinct contractual stipulation of the parties had been in the lease when it was canceled in *429 1939, we would have a different question. Compare Hood & Gross v. United States, 90 C. Cls. 258; James I. Barnes v. United States, 92 C. Cls. 32; United States v. Kansas Flour Mills Corporation, 314 U. S. 212; Dameron & Kenyon, Inc. v. United States, ante, p. 133. The Postmaster General had no authority, and claimed none, under any existing statute to cancel the lease and I think it is clear that he had no legal right to do so under any express or implied stipulation of the lease.
The next phase of the question relates to the contention of counsel for the Government that the repealing act of June 19, 1922, was wholly prospective and was intended by Congress to apply only to leases subsequently made. The repealing act was, as held by the court in Railroad Company v. Grant, 98 U. S. 398, 401, 403, “undoubtedly prospective in its operation.” It was not expressly retroactive and was not intended to be retroactive so as to become effective at some prior date, as is true of all such statutes, but this does not answer the question here involved. The act was effective from the moment of its approval and, as has uniformly been held by the Supreme Court, it affected and operated upon existing and future rights and liabilities of the parties under an existing arrangement or contract which depended upon the repealed statute. When the 1922 Act was approved the Postmaster General no longer had authority under the repealed act to cancel the contract.
While it is true that one of the purposes, and it may be said the principal purpose, considered by Congress in repealing the Act of 1885 was its effect upon the cost to the government of long-term leases, this does not warrant the court in departing from the rule that courts must presume that Congress meant the language employed should have its usual and ordinary signification, or warrant the court in en-grafting upon the statute a proviso not justified by its language, or by the express saving clause which became a part of the enactment as fully as if it had been incorporated as a part thereof. As was held by the court in Farmers’ Loan & Trust Co. v. Oregon & C. Ry. Co., 24 Fed. 407, a plain provision of a statute cannot be construed so as to exclude a particular case from its operation upon a surmise or *430 conjecture, however probable, that the legislature did not actually contemplate, or consciously intend, its application thereto. County of Schuyler v. Thomas, 98 U. S. 169; McBroom v. Scottish Mortgage and Land Investment Company, 153 U. S. 318. In Thompson v. United States, 246 U. S. 547, it was held, that the intention. of Congress is to be sought , primarily by the language uséd, and'where this expresses an intention reasonably intelligible and plain, it must be accepted without modification by resort to construction or conjecture. United States v. Fisher, 2 Cranch, 358, 399; United States v. Wiltberger, 5 Wheat. 76, 96; Doggett v. Florida Railroad, 99 U. S. 72; Lake County v. Rollins, 130 U. S. 662, 670; Danciger v. Cooley, 248 U. S. 319, 326; Moore v. United States, 249 U. S. 487, 489; De Ganay v. Lederer, 250 U. S. 376, 381; Osaka Shosen Kaisha Line v. United States, 300 U. S. 98, 101.
The Act of June 19, 1922, as it passed the House of Representatives January 13, 1922, did not contain any provisions modifying or repealing any provisions of the Act of 1885. The matter of repeal of the Act of 1885 was not discussed in the hearings of the House Appropriation Committee on this bill. The appropriation bill which' became the Act of June 19,1922, was considered by the Commmittee on Post Offices and Post Roads of the Senate and was reported by that committee to the Senate March 13, 1922, with ■ amendments. The chairman of this committee was the chairman of the Joint Commission on Postal Service which had been for some time, and was then, considering the matter of postal leases and of the repeal of the termination clause of the Act of 1885. As reported by the Senate Committee, the appropriation bill contained the following amendments — “For rent, light, and fuel for first, second, and third-class postoffices, $12,000,000; * * *. And, provided further, That hereafter a lease shall not cease or terminate when a postoffice can be moved into a Government building, unless the Postmaster General deems it to be in the interest of the public service.” The appropriation bill as amended was accompanied by a report of the Senate Committee on Post Offices and Post Roads, Report No. 556, 67th Cong., 2d sess. In this report the committee quoted, *431 in part, from the Annual Report of the Postmaster General for the fiscal year ended June 30, 1921, with reference to ■certain matters, and stated as follows:
Increased rental charges for post-office quarters during the past few years have caused material increases in the appropriation for this item.- As a result of the advance in rentals the department has been unable to renew leases, even for short periods, at either the old rate or slight increase, thus necessitating entering into new leases at increased rates. * * *. _
_ It is the opinion of the committee, considering the increases in rentals and the extraordinary demand for enlarged quarters for the handling of parcel post mail, that the appropriation for rent, light, and fuel should be fixed at $12,000,000 instead of $11,600,000, as proposed in the House bill.
The fixed charges against this appropriation as of January 31, 1922, were $11,345,000, with 536 leases ■expiring in 1923, which, under present conditions, will have to be renewed at increased rentals of from 40 to '90 per cent, an average of about 60 per cent. * * *.
The further proviso under this item that leases shall not cease or terminate when a post office may be moved into a Government building, unless the Postmaster General deems it to be in the interest of the public service, gives the Postmaster General proper authority to exercise his best judgment. It is believed that a large amount of money can be saved to the Government in the low rents paid if the department is permitted to buy rather than rent furniture and fixtures, and by ■eliminating the usual provision for lease cancellation in case the Government moves into its own building where there is no probability of moving into such building. It is a reasonable and proper provision.
It seems obvious from the above-quoted amendment, which ■was approved by the Senate March 20, 1922, that the bill would, if it had finally been enacted in that form by both ■houses of Congress, have applied to existing leases, as well as to those thereafter made, for the reason that the language used was that thereafter a lease, that is any lease, should not ■.cease or terminate except in the discretion of the Postmaster -General even if a Government building should become avail, -•able; and this would have been true under the clear language <of that provision, because it was speaking of future termi *432 nation, although the main purpose in its enactment, as stated by the committeee and by the chairman on the floor of the Senate, was the probable saving to the Government in the cost of future leases. However, the above-mentioned amendment was subsequently eliminated in conference on the appropriation bill, and the repealing provision, as theretofore drafted and recommended by the Postmaster General, was enacted instead under the circumstances as hereinafter more fully stated.
On March 21, 1922, the House of Representatives ordered the Post Office Appropriation Bill as passed by the Senate printed, and disagreed with the Senate amendments. On March 24 and 25, 1922, the House Committee on Post Office and Post Hoads held hearings on legislative amendments which had been made by the Senate to the Post Office Appropriation Bill, one of which amendments was the modification of the Act of 1885 so as thereafter to leave it discretionary with the Postmaster General as to whether any post-office lease should cease or terminate if a Government building should become available. At that time H. R. 10244 for the outright repeal of the termination clause of the Act of 1885 was pending before the House-Post Office and Post Roads Committee and the hearings-were held by that committee on this bill in connection with the amendments passed by the Senate. On March 28, 1922,. the Postmaster General wrote the chairman of the House-Committee on Post Office and Post Roads approving and urging the enactment into law of H. R. 10244 in place of' the Senate amendment (House Report #839, 67th Congress,. 2d sess.). The Solicitor of the Post Office Department and the Superintendent of the Post Office Service appeared before the House Post Office and Post Roads Committee and testified in support of the enactment of the repealing act as provided in H. R. 10244 in lieu of the amendatory provision which had been approved by the Senate. This was thirteen days after the lease in the case at bar had been approved' and signed by the Postmaster General and the Solicitor-of the Post Office Department without any stipulation agreeing that it would cease and terminate, or be subject to: cancelation on the ground on which the Postmaster Gen *433 eral canceled it seventeen years later. These hearings before the House Post Office and Post Roads Committee also show that the pending bill, H. R. 10244, for the repeal of the mandatory termination clause of the Act of 1885 had been discussed with the chairman of the House Appropriation Committee, who was also chairman of the House Conference Committee, on the disagreement with the Senate amendments, and that the Conference Committee of the House •favored the enactment of the repealing act in lieu of the Senate amendment. On March 27, 1922, the House Committee on Post Office and Post Roads recommended the passage of H. R. 10244 repealing the law relating to the termination of post-office leases without amendment. Thereafter, in the conference between the Senate and the House on the Post Office Appropriation Bill, the Senate receded from its amendment modifying the termination clause of the existing statute and agreed to the enactment as a provision of the appropriation bill of the exact provisions of H. R. 10244. As so amended in conference, the Appropriation Bill was enacted by both Blouses apparently without further discussion and became the Act of June 19, 1922.
From all of this it is manifest, I think, that it was the -clear intention of Congress that the enactment of this repealing provision with the provision of the existing law, sec. 29, Tit. 1, U. S. Code, as an express proviso thereto should have force and effect according to the usual and ordinary signification of the language used. There is, therefore, no warrant for an assumption based on conjecture or after-acquired wisdom that if Congress had deliberately put its mind directly upon the matter it might have expressed some other intention. Such an assumption amounts to judicial legislation which is uniformly condemned. Where, as here, the language of the statute is clear and sufficient to express a definite purpose as to its effect, a court should not supply, by assumption, a different intention by interpolating its notions of policy into the legislative provisions. The statute of 1922 as it was enacted when interpreted and applied consistently with section 29, Tit. 1,17. S. Code, definitely expresses the intention as to its limitations.
If there exists a basis for any assumption of any *434 intent other than that disclosed and expressed by the usual and ordinary signification of the language of the enactment and the applicable saving clause, it would seem that the intention was no more than that accrued or incurred rights or liabilities under existing leases should be preserved and that whether any lease should in the future terminate or be subject to cancelation should depend upon whether such lease contained, as a matter of contractual stipulation or agreement by the parties, an express provision to that effect.
During the time of consideration and enactment of the repealing act, Congress had before it the Annual Report of the Postmaster General made in November 1921 for the fiscal year ended June 30, 1921, and the testimony of the Postmaster General before the Joint Commission on Postal Service, which showed that long-term leases were entered into by the department only “where the terms of such leases are advantageous to the Department.”
In his Annual Report to C-ngress for the fiscal year July 1, 1920, to June 30, 1921 . pp. 25, 26) the Postmaster General stated in part as follows:
Quarters for post offices of the first, second, and third classes, or what are known as presidential offices, come under three general classes, namely, Federal buildings, leased quarters, and rented buildings. Leased quarters are under a term contract, varying from 1 to 20 years, which usually includes rent, light, fuel, and the necessary permanent equipment. Where the terms of the lease are advantageous to the department, contracts are entered into for a long period, ranging from 5 to 20 years. * * *.
Of the 14,058 presidential offices on June 30, 1921, 1,113 were housed in Federal buildings, of which 652 were first-class offices, 453 of the second class, and 8 of the third class. Of the remaining 12,945 offices, quarters are provided! under term leases at 4,281, and 8,064 occupy quarters under a rental agreement without lease, leaving 600 offices for which postmasters are furnishing quarters without an allowance therefor from the department. * * *.
At no time within the history of the Postal Service has the question of housing been so serious. This condition is _ due to three general causes, viz, the enormous increase in the volume of mail, with particular reference *435 to parcel post, the restrictions laid upon building operations during the war, and the high cost of labor and building materials still prevailing.
Owing to the last two factors, practically all Government building operations were suspended during the war, and they have not since been resumed. * * *. In many instances, notably in New York, Chicago, Boston, Cleveland, Indianapolis, Pittsburgh, Cincinnati, Los Angeles, Newark, etc., the quarters in the Federal buildings have long since been outgrown, and the only immediate avenue of relief is the establishment of stations and annexes.
During the year a total of 879 lease contracts were made, involving an annual expenditure for quarters of $1,954,436. Of this number, 77 were for new projects— chiefly in the larger cities — at a yearly cost of $598,680, while 802 were necessitated by expiring and canceled leases. In many instances larger and more centrally located quarters were imperative, which greatly added to the cost. The total annual rental of these 8Ó2 leaseholds is $1,355,756, an increase of $819,365, or 153 per cent, over the previous contracts.
The greater proportion of this increase was of course made in the large cities — for instance, Varick Street Station of New York with 163,156 square feet of floor space, requiring a rental outlay of $400,000 for the first year and $300,000 per annum thereafter, the period of the lease being 20 years. In Boston we have an annex, chiefly for parcel post, the rental for which is $125,000 a year, and in Chicago and St. Paul similar stations at like rentals.
$ $ H> * *
Negotiations are now pending for necessary additional buildings in New York and other large cities which will involve large expenditures in rentals in 1922.
I find no justification in the record, or in the congressional hearings or reports, for.the contention of counsel for the defendant that the Postmaster General in 1939 had the clear right to cancel the lease because it was strictly a contractual right and that it was a privilege “bought and paid for, and remains unaffected by repeal of the statutory provision.” The testimony of the Postmaster General given to Congress before the repealing act was enacted and before the lease was executed clearly showed, as hereinbefore indicated, first, that term leases were entered into only where the rental to be paid *436 by the Government was reasonable for the facilities acquired; second, that long-term leases enabled the Government to get lower rentals; third, that in long-term leases buildings were specially constructed by the lessor to suit the peculiar needs of the Post Office Department and, prior to advertising for bids, negotiations were always carried on with the owner of the property at the location where the department desired to establish a postal station, which negotiations included all phases of financing costs and expenses to the lessor and the total amount to be paid by the Government as an annual rental, so as to produce no more than a reasonable return to the lessor upon his costs and investments in providing a building according to the specifications of the department; and fourth, that any amount which the Government might have to pay in connection with the annual rental, because of the existence of the termination clause of the Act of 1885, was due in almost every case to increased costs to the lessor in financing the project by reason of an increase in the rate of interest or financing charge made by the banks and not an increase in the return to the lessor.
It seems clear to me that at the time this lease was canceled by the Postmaster General in 1939 neither the contract itself nor the law conferred upon him authority to do so.
The majority opinions do not discuss the other defense interposed, to wit, that no appropriation has been made for payment of the rent under this lease. I do not think this feature of the case has any merit or that it requires much discussion. I am of opinion that this defense is not good. Twin Cities Properties, Inc. v. United States, 90 C. Cls. 119, 130. See, also, Collins v. United States, 15 C. Cls. 22; Freedman’s Savings & Trust Co. v. United States, 16 C. Cls. 19; Spofford v. United States, 32 C. Cls. 452; Ferris v. United States, 27 C. Cls. 542. There were only two references in the lease to the matter of appropriation by Congress, but these references clearly were not intended as a basis for termination or cancelation of the lease by the Postmaster General, The law under which the Postmaster General acted in making the lease specifically authorized him to make the lease for a term of twenty years. And it further authorized him “in the disburse *437 ment of the appropriation for such purposes, to apply a part thereof to the purpose of leasing premises.” Moreover, there was no deliberate refusal of Congress to appropriate money for the payment of rent under valid leases, and even if there had been such a refusal the lessor would not, as a matter of law, be barred from recovery if the lease was otherwise legal and. valid, as I think it was. The first reference in the lease to the matter of appropriation by Congress was the provision inserted clearly for the benefit of the lessor as a condition to the stipulations and covenants of the lessor to keep, at his own expense, such building, including heating, lighting, plumbing fixtures, etc., in good repair and condition during the full term of the lease to the satisfaction of the Postmaster General and to furnish and supply, at its own expense without increased rental, such additional heating and lighting fixtures as the increasing needs of the service might require in the opinion of the Postmaster General, and to keep the additional heating and lighting fixtures in like good repair and condition, with all the ways of ingress and egress, and all of the rights and privileges thereunto belonging for the use of the United States, as and for a post office for, during, and until the full end of the term of twenty years then next ensuing, and thereafter from the first day of October, 1921. The other reference to appropriation by Congress from year to year had reference solely to the promise of the Postmaster General to pay the stipulated annual rental quarterly for the full term of the lease of twenty years. In other words, the Postmaster General simply stipulated, as would have been true without any express stipulation, that so far as his authority to pay the stipulated rental from year to year was concerned, he, as an executive officer, could only disburse Government funds to the extent appropriated and it was therefore provided in the lease that his unconditional promise to pay the rent at the rate of $400,000 for the first year and at the rate of $300,000 for the balance of the term of nineteen years, was “subject to the necessary appropriation from year to year, as aforesaid, or otherwise as may be provided by law.” Had Congress refused without justifiable cause to make an appropriation for the payment *438 of rent due under a lease made by its express authority,, such action would have amounted to a breach of the contract. Cf. Hays v. Port of Seattle, 251 U. S. 233; Wells v. Boyer, 246 U. S. 335. As a matter of fact, in this case, the situation was simply that the Postmaster General had undertaken to cancel the lease upon what he thought was justifiable ground and he only asked for an appropriation, so far as this lease was concerned, of an amount sufficient to pay the stipulated rental to August 31,1939, when he moved the postal facilities out of the leased premises, and Congress simply appropriated the total amount of $10,450,000 for the fiscal year ending June 30, 1940, on May 6, 1939, for the payment of rent, etc., any part of which the Postmaster General was authorized under existing law to disburse for the payment of rent for leased premises. Cases like Hooe v. United States, 218 IT. S. 322, are not applicable.
I am of the opinion that the plaintiff is entitled to recover under its contract with the defendant.
Whitaker, Judge, concurs in this opinion.

 Hearings before a Joint Commission on Postal Service, Vol. 1, pp. 66, 67, 107-110, 119-121, 207, 208, 234, 235, 580, 581-583.

 Hearings before a Joint Commission on Postal Service, Vol. 2, pp. 954-8, 972, 973, 1029, 1035, 1036, 1080, 1087, 1088.